IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 5, 2023

## ROGER TERRELL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-21-161          Kyle C. Atkins, Judge**

_____

**No. W2023-00039-CCA-R3-PC**
_____

Petitioner, Roger Terrell, appeals from the Madison County Circuit Court's denial of his petition for post-conviction relief. On appeal, Petitioner contends he received the ineffective assistance of counsel at trial. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, Roger Terrell.

Jonathan Skrmetti, Attorney General and Reporter; Katharine K. Decker, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts and Procedural History

#### A. Trial

After a Madison County jury trial, Petitioner was convicted of one count of aggravated sexual battery and seven counts of rape of a child. The victim was Petitioner's then-stepdaughter. The trial court sentenced Petitioner to an effective term of fifty-eight years' imprisonment in the Tennessee Department of Correction. This court affirmed Petitioner's convictions and sentences on direct appeal. *State v. Terrell*, No. W2019-

01023-CCA-R3-CD, 2020 WL 5587415, at \*1 (Tenn. Crim. App. Sept. 17, 2020). Petitioner did not file an application for permission to appeal to the Tennessee Supreme Court.

The evidence produced at trial, as summarized by this court on direct appeal, established that the victim's mother met Petitioner in 2010, and they were married between 2012 and 2015. *Id.* The victim's mother did not learn about the abuse until January 2016. *Id.* At trial, the victim's mother testified regarding her reporting of the abuse to local law enforcement and the Department of Children's Services (DCS). *Id.* The victim testified in detail regarding Petitioner's sexual abuse. *Id.* at \*2-4. After the victim's mother reported the victim's abuse, the victim was examined by Dr. Lisa Piercey, who this court described as "a pediatrician specializing in child abuse[.]" *Id.* at \*4. Dr. Piercey testified that the victim's injuries were "very consistent with the description [the victim] gave of multiple episodes of penile penetration." *Id.* (internal quotation admitted). Dr. Piercey also testified that she administered testing for sexually transmitted diseases (STDs) as part of her examination, and the victim tested positive for chlamydia. *Id.* She added that the Centers for Disease Control "considers that chlamydia in childhood, outside of the newborn period, is definitive evidence of sexual contact." *Id.*

Dr. Rebecca Nass, a physician who treated Petitioner when he visited her office in September 2015, testified that Petitioner tested positive for chlamydia after being tested during that visit. *Id.* at \*5. She also tested Petitioner for STDs when he visited her office in March 2016, and "Petitioner's results were negative at that time." *Id.* Petitioner testified on his own behalf, denying any improper activity with the victim. *Id.* at \*6. Petitioner testified he did not know why the victim would "make up allegations against him," and he also asserted the victim was sexually active with someone else. *Id.*

As stated above, the jury convicted Petitioner, and this court affirmed Petitioner's convictions on appeal. *Id.* at \*7-16.

B. Post-Conviction

On July 21, 2021, Petitioner filed a timely pro se petition for post-conviction relief. The post-conviction court appointed counsel for Petitioner, but no amended petition appears in the appellate record. The post-conviction court held a hearing December 13, 2022.

At the hearing, Petitioner testified he was first arrested in Gibson County in January 2016, and was arrested in Madison County one month later on charges related to this case. At the time of his Gibson County arrest, a bail bond agent suggested he hire a particular attorney (referenced here as "Co-counsel"). Petitioner did so, but at some point Co-counsel

recommended that Petitioner hire another attorney (referenced here as "Counsel") to try the case if Petitioner sought a trial. Petitioner did so, and he met Counsel for the first time at the Madison County preliminary hearing.

Petitioner recalled that Counsel cross-examined the victim at the preliminary hearing, and Petitioner acknowledged that he was satisfied with Counsel's performance based on "the fact that he responded to the prompts that [Petitioner] gave him about the issues that were being discussed[.]" Specifically, Petitioner said he passed Counsel notes during the hearing, and Counsel asked questions based on these notes. Petitioner testified that the victim "didn't respond too well to the questioning. She kind of cried about it."

Despite Petitioner's apparent satisfaction with Counsel's initial representation, the attorney-client relationship soon deteriorated, at least in Petitioner's view. For instance, Petitioner recalled Counsel told him that the defense attorneys would not be ready for the scheduled trial date of September 2017, but Counsel asserted the trial court would not move the trial date.[1]

Petitioner recalled that his attorneys explained to him that Dr. Piercey was a "paid state witness," but Petitioner asserted the attorneys never showed him the report she filed as part of her testing of the victim. Petitioner recalled that Counsel did not cross-examine Dr. Piercey at trial; Petitioner claimed Counsel's "exact words were, 'We're going to get her off the stand as quickly as possible because she's lied before and she'll lie again and we don't want to take any risks.'" Petitioner thought Counsel's choice not to cross-examine the State's expert was "crazy. [She's] the State's main witness. You've got to cross-examine [her]." Petitioner acknowledged that he wanted his attorneys to ask her several questions, including how a person could contract an STD.

Petitioner also testified that "there were things that [he] had disclosed to [his] attorneys about things that [he] had witnessed in the home that they ultimately told [him] [they] were not going to use because the State would think [he] was a liar." Petitioner also claimed he "willfully offered [his] medical records and [his] DNA, but . . . there was nothing forthcoming from anything that the State did about [the victim] other than to further the allegations against [Petitioner]." He also claimed the State "provided [them] with no additional information no matter what [they] requested." Petitioner claimed the trial court ruled that his attorneys did not "have any legal basis to ask for those records."

Petitioner asserted that he spoke with his attorneys about calling expert witnesses to rebut Dr. Piercey's testimony, but the attorneys did not call any expert on Petitioner's behalf. Petitioner said he "had friends in the medical profession that would have been

---

[1] Petitioner's trial was held September 19-21, 2017.

willing to testify. We talked about that." Petitioner claimed Counsel only consulted with "his personal physician," with whom Petitioner did not speak.

Petitioner also claimed he presented the attorneys with potential witnesses who would have "clear[ed] the mud" regarding the timeline of events in this case. The proposed witnesses included Kevin Ashworth, his roommate at the time of his trial. Petitioner testified that between 2010 through 2013 or 2014, Mr. Ashworth was at Petitioner's house "[ninety] percent of the time," and while Petitioner's attorneys asked Petitioner who Mr. Ashworth was, the attorneys did not interview Mr. Ashworth. Petitioner also claimed he told his attorneys to interview his mother and his two sons, one of whom had died between trial and the post-conviction hearing. As with Mr. Ashworth, Petitioner claimed his defense team did not interview these family members. Petitioner stated he met with his attorneys "three to five times" to discuss the timeline of events, and he claimed he wrote down a timeline on paper for Counsel to present at trial. Petitioner claimed, however, the timeline of events presented by his attorneys at trial was incorrect and made it "appear to the jury that [Petitioner] was lying about the most trivial of the details[.]" Petitioner testified that had he known his attorneys did not plan to call anyone other than Petitioner at trial, he "would have strongly considered a plea deal" or "would have petitioned the Court to change counsel and tried to find somebody that was objective[.]" Petitioner acknowledged that he did not fire his attorneys or complain about the attorneys to the trial court before trial.

Petitioner testified at trial and said that before his testimony, he and his attorneys only "talked half-heartedly about some of the things that might happen[.]" Petitioner claims that Co-counsel advised him that "if we get into territory . . . that is uncomfortable and you see me stand up, stop talking." When Co-counsel stood during Petitioner's testimony, Petitioner claimed that the prosecutor "jump[ed] on [Petitioner] immediately" and told Petitioner, "'Don't look at him, look at me.'" Petitioner claimed that he "knew when it happened that he had played me. I knew right then it was courtroom theatrics, it was bulls***[.]" Petitioner also said Counsel did not consult with him before filing the direct appeal and did not discuss the issues raised in the appeal.

Petitioner claimed he was never shown a written plea offer by his attorneys. He claimed that at a motion hearing or "the weekend before trial," his attorneys relayed a verbal plea offer of "[thirty] years at [thirty] percent." But he claimed his attorneys did not tell him the offenses to which he would be pleading guilty, so Petitioner did not accept the plea. He also claimed he did not receive the entire Circuit Court file until over two years after his conviction. In those records, Petitioner claimed, he discovered a written plea offer, "dated 2016, which would have been long before [they] went to trial. And it was a [thirty]-year offer with a [twelve] . . . to run concurrent[.]" Petitioner claimed he had "never seen" the offer. Petitioner claimed that Counsel's handing of the plea agreement "was very

- 4 -

wishy-washy . . . and it was only a verbal discussion." He added that if his attorneys "had just been forthright" with him about the relative weakness of Petitioner's case, he "would have strongly considered a plea deal[.]"

Petitioner faulted Counsel for not objecting at certain times. For example, he acknowledged Counsel did not object to the State's opening statement and closing argument. Petitioner claimed Counsel did not meet with him to discuss potential objections. Petitioner claimed his attorneys "didn't have a game plan," and that Co-counsel told him to put his "faith" in Counsel, because Counsel "was going to do way more than [the State]."

Petitioner also asserted he had given his own medical records to his attorneys, but Counsel "withheld them" from the State until the State filed a motion to compel the records. Petitioner claimed only "part" of his medical records were presented at trial but his attorneys did not attempt to introduce all the records. He also faulted his attorneys for not introducing the complete "medical timeline," regarding when he, the victim's mother, and the victim tested positive for their respective STDs, and when Petitioner tested negative for them. Petitioner claimed he had met with his attorneys several times to correct the medical timeline, yet he insisted they did not introduce the correct, complete timeline. Petitioner asserted that the jury had asked to review the medical records during deliberations, at which point Co-counsel supposedly told Petitioner the jury was "smart enough to figure this out. Don't worry[.]" Petitioner claimed he replied, "It's . . . kind of late to be telling me that. You—we were supposed to present that."

Petitioner took issue with Counsel's questions during voir dire regarding whether any of the potential jurors "had ever had an STD." Petitioner claimed these questions "alienate[d] the jury pool immediately, and probably cast me in a pretty ugly light[.]"

Counsel testified for the State. He had been licensed to practice law since 1990, and at the hearing he stated that between "[ninety-five to ninety-eight] percent" of his practice was in criminal law. He testified that he and Co-counsel practiced together approximately fifteen years before Counsel left to start his own practice. He said "it was not uncommon for [Co-counsel] to contact me and [for] us to work together on cases after I established my own firm." Counsel recalled that Co-counsel enlisted his help shortly before the preliminary hearing. Counsel said he also employed a criminal investigator who was a former Madison County deputy sheriff; this investigator worked on Petitioner's case as well.

Counsel testified that as of Petitioner's trial, the local District Attorney General maintained an "open file" discovery process, and after the defense team (both attorneys

and the investigator) reviewed discovery, members of the defense team met with Petitioner to discuss his case.

Counsel said he met with Petitioner "extensively" to develop a defense strategy before trial. Counsel said these meetings included discussions on at least "two or three weekends[.]" The defense team also constructed a timeline of case events based on the discovery and the information Petitioner provided.

Counsel testified he communicated both of the State's plea offers in this case. Counsel recalled the first offer was for eighteen years; Counsel stated that he, Co-counsel, and the investigator all advised that Petitioner accept the deal because "the potential at trial for a loss and the fact that he would get a number of years more was great." Petitioner rejected the initial offer, but as jury selection was beginning the State made a twelve-year offer. Counsel discussed the offer with Petitioner, who "wanted to go forward and that was okay."

Before trial, Counsel filed motions to admit certain medical records and proof regarding the victim's supposed prior sexual activity. Counsel acknowledged that the trial court rejected his attempt to admit this evidence. Regarding Dr. Piercey's testimony, Counsel said, "If the record shows we did not cross-examine her, then there was a reason for that . . . in our opinion it would not have been beneficial to the defense." He further testified, "With experts you have to be very careful. Experts are usually very knowledgeable, they're usually very smart. . . . [I]f you're not sure what the [answer]'s going to be, you shouldn't ask it at all." Counsel testified that in such situations he would have explained his decision to his client.

Counsel testified he had encountered Dr. Piercey as a State witness in several trials. Counsel acknowledged that she routinely filed written reports as part of her sexual assault evaluations, and he "routinely object[ed]" when Dr. Piercey's report opined that a child had suffered sexual abuse. Counsel did not recall whether he objected to this portion of the expert's report in this case, but he stated that in Petitioner's case the defense theory "was not that . . . the child had not had sexual contact, because the child had [an STD]. It was not a defense of it didn't happen, it was a defense of it was not [Petitioner]." Counsel added that he did not recall whether Dr. Piercey's report opined that the victim had suffered sexual abuse, but he added that in this case "the allegations were made at a later time and not contemporaneously with the acts. So in almost all those cases there is never any physical . . . proof." When Petitioner was asked whether Dr. Piercey, through her testimony or her report, was "testifying about the credibility of the child," Counsel replied, "I routinely object to those opinions. They're almost always overruled."

Counsel recalled consulting with potential experts about this case, and he guessed Co-counsel did as well. Counsel was unable to recall these persons' names. Counsel acknowledged the potential experts would have added nothing beneficial to the defense case. Regarding Petitioner's contention that Counsel did not call witnesses Petitioner wanted called (including Petitioner's sons and his roommate), Counsel testified someone on the defense team (one of the attorneys or the investigator) "would have talked to them at some point. And then we would have discussed whether or not they were beneficial to the case or helpful or would have had testimony that would have been relevant." Regarding Petitioner's assertion that Counsel did not present the timeline of events accurately, Counsel said, "Whatever we presented [to the jury] at the time would have been what we went over" with Petitioner.

Counsel stated he objected when appropriate, but generally "[i]t is not in my client's best interest to do that in every situation. . . . [F]or instance, [questions] that are leading but are not hurting us, I don't object to." Specifically, Counsel acknowledged he did not raise prosecutorial misconduct, as was raised in the post-conviction petition, at trial or on appeal. Counsel stated he questioned potential jurors in voir dire about STDs because of anticipated testimony regarding both the victim and Petitioner having "the exact same [STD]. So we for sure wanted to know if there were any potential jurors who had any kind of experience with that ahead of time." Counsel stated he was "surprised at the number of jurors who volunteered that information and very pleased that the system worked the way it did."

At the end of the evidentiary hearing, the post-conviction court made oral findings of fact and conclusions and denied Petitioner's claims for relief. In so doing, the post-conviction court found Counsel to be a credible witness.

Regarding those claims addressed in this court's opinion, the post-conviction court first found that Counsel was not ineffective for declining to cross-examine Dr. Piercey. The court found that Counsel's choice not to cross-examine the State's expert was "trial strategy . . . because [Counsel] thought it might do more damage than good." The court also found that the defense theory was not that the victim was not sexually abused, but that Petitioner was not the perperator. The court also found "there's been no expert proof to show how [Dr. Piercey's] testimony . . . or a cross-examination would have made a difference in the outcome of the case."

Regarding Petitioner's claim that Counsel was ineffective in failing to call expert witnesses to rebut Dr. Piercey's testimony, the post-conviction court observed that no expert had presented testimony "that would show how the outcome of this case would be different and how counsels' performance in this case was deficient." Similarly, the trial

court found there was no proof how the testimony of Petitioner's friends and family "would have helped."

Regarding Petitioner's contention that his attorneys failed to communicate the State's plea offers, the post-conviction court observed that Counsel "testified that he discussed the original offer of [thirty] years . . . and then the [eighteen years], and then on the day of trial an offer of [twelve years] was made and [Petitioner] turned that down. And I think [Petitioner] testified today that he wanted to go to trial[.]"

The post-conviction court identified several other ineffective assistance of counsel claims raised by Petitioner. These included Petitioner's claims that his attorneys were ineffective by (1) failing to present proof of the victim's prior sexual history; (2) failing to object to the State's opening statement and closing argument; (3) failing to object to Petitioner's "incomplete medical record"; (4) presenting the testimony of Dr. Nass, which prejudiced Petitioner; (5) failing to object to the State's "interjection that someone else did this to the victim"; (6) failing to object to certain trial court rulings; (7) failing to suppress Petitioner's medical records; (8) failing to subpoena the victim's medical records; (9) failing to prepare and misleading the jury; and (10) failing to present a correct timeline. The post-conviction court found these claims to be without merit.

On January 11, 2023, in accordance with Tennessee Code Annotated section 40-30-111, the post-conviction court subsequently entered a detailed written order addressing all of Petitioner's claims, and stated its findings of facts and conclusions of law regarding those claims. The court denied Petitioner relief, and this appeal follows.[2]

## II. Analysis

### A. Standard of Review: Post-Conviction Proceedings

To obtain post-conviction relief, a petitioner must establish his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of the United States or Tennessee Constitution." Tenn. Code Ann. § 40-30-103. A petitioner bears the burden of proving the factual allegations contained in the petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *see* *Dellinger v. State*, 279 S.W.3d 282, 296 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn

---

[2] Petitioner filed his notice of appeal on January 9, 2023. The post-conviction court did not file a written order denying relief until January 12, 2023. "A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof." Tenn. R. App. P. 4(d).

from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Appellate courts do not reassess the post-conviction court's determination of the credibility of witnesses. *Dellinger*, 279 S.W.3d at 292 (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the post-conviction court as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, a post-conviction court's factual findings will not be disturbed unless the evidence contained in the record preponderates against the findings. *Brooks v. State*, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988); *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). On the other hand, conclusions of law are given no presumption of correctness on appeal. *Dellinger*, 279 S.W.3d at 293; *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

We review "a post-conviction court's conclusion of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (first citing *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011); and then citing *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011)). Even so, the post-conviction court's underlying findings of fact may not be disturbed unless the evidence preponderates against them. *Dellinger*, 279 S.W.3d at 294 (Tenn. 2009) (first citing Tenn. R. App. P. 13(d); and then citing *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006)). As a result, the appellate court is "not free to re-weigh or reevaluate the evidence, nor [is it] free to substitute [its] own inferences for those drawn by the post-conviction court." *Whitehead*, 402 S.W.3d at 621 (citing *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001)).

## B. Ineffective Assistance of Counsel

On appeal, Petitioner argues that he received the ineffective assistance of counsel. Both the United States Constitution and the Constitution of the State of Tennessee guarantee criminal defendants the right to effective assistance of counsel. U.S. Const. amend VI; Tenn. Const. art. I, § 9. Under the Sixth Amendment to the United States Constitution, when a petitioner raises an ineffective assistance of counsel claim, the burden is on the petitioner to show both (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-372 (1993). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). To prevail on such a claim, a petitioner must prove both prongs of the *Strickland* test, and failure to prove either is "a sufficient basis to deny relief on the claim." *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "[A] court need not address the components in any particular order or even address both if

the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

An ineffective assistance of counsel claim presents a mixed question of law and fact. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). As a mixed question of law and fact, this court's review of a petitioner's ineffective assistance of counsel's claims is de novo with no presumption of correctness. *Felts*, 354 S.W.3d at 276 (citations omitted).

To prove that counsel's performance was deficient, a petitioner must establish that his attorney's conduct fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. As our supreme court held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 934-35 (Tenn. 1975)). A review of trial counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Appellate courts "may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation." *Alley v. State*, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). Further, we cannot criticize a sound, but unsuccessful, tactical decision made during the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

To prove prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." *Id.* As such, a petitioner must establish that his or her attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *Burns*, 6 S.W.3d at 463).

## C. Petitioner's Issues

### 1. Failure to Cross-Examine Dr. Piercey

Petitioner argues Counsel rendered ineffective assistance because he elected not to cross-examine Dr. Piercey regarding the findings of her sexual assault examination. Instead, Petitioner asserts Counsel's choice to "simply 'object[]' when Dr. Piercey testified on direct examination even though Counsel kn[ew] the objection [was] likely to get overruled" fell "below the standard of reasonableness" and "left the jury with only one perspective and strengthened the testimony of Dr. Piercey in [a] way that was unfairly prejudicial" to Petitioner. We disagree.

At the post-conviction hearing, Petitioner acknowledged only one potential question Counsel should have asked the State's expert, one regarding the manners in which a person could have "caught" an STD. Counsel was not asked about other questions he could have asked Dr. Piercey, and while he did not remember his exact reasoning for not cross-examining her, Counsel stated that if he chose not to cross-examine a State expert, it would have been because "in our opinion it would not have been beneficial to the defense." Counsel also testified that he routinely discussed such plans with his clients, although at trial if Counsel still planned not to ask an expert witness questions Counsel would confer with his client to determine if there was "anything [the client] want[ed Counsel] to specifically address[.]"

The post-conviction court concluded Counsel's decision not to cross-examine Dr. Piercey was a "matter of trial strategy," and this court has not been presented with any evidence to contradict that conclusion. Petitioner has not, either at the post-conviction hearing or on appeal, identified specific questions (except for one) that Counsel should have asked Dr. Piercey, nor has Petitioner explained how the expert's answers to those questions would have benefitted Petitioner's case. And as the State observes in its brief, Petitioner had the opportunity to call Dr. Piercey as a witness at the post-conviction hearing, which would have allowed him to place on the record the supposedly unasked questions and the expert's answers. However, Petitioner failed to do so.

Thus, as the Petitioner has failed to establish that Counsel was deficient in failing to cross-examine Dr. Piercey, and Counsel's strategic decision did not prejudice Petitioner. Petitioner has failed to establish Counsel was ineffective as to this issue.

### 2. Failure to Communicate Plea Offers

Petitioner argues Counsel was ineffective in that Counsel "failed to adequately discuss plea offers made by the [S]tate." The State contends that Counsel was not

ineffective in that "the post-conviction court noted and implicitly credited [Counsel's] testimony that he discussed the State's plea offers with [Petitioner]" and that Petitioner "rejected the offer made the weekend before trial[.]" We agree with the State.

"The *Strickland* standard for determining whether a defendant received effective assistance of counsel applies during plea negotiations as well as during trial." *Nesbit v. State*, 452 S.W.3d 779, 787 (Tenn. 2014) (citing *Missouri v. Frye*, 566 U.S. 134, 144-45 (2012)). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145.

Petitioner asserts on appeal that that he learned about the State's sole "formal plea offer" (involving a thirty-year sentence) only after reviewing the record after trial. However, at the post-conviction hearing Petitioner recalled counsel informing him about a potential plea agreement of "[thirty] years at [thirty] percent, with a chance to come off the registry after [five or ten] years." Petitioner's argument on appeal conflicts with his testimony at the hearing. Furthermore, as the State notes in its brief, the post-conviction court "implicitly accredited" Counsel's testimony that he communicated the State's two pretrial plea offers (one with an eighteen-year sentence and another with a twelve-year sentence). As such, this court will not disturb the post-conviction court's findings on appeal. Because Counsel communicated the State's plea offers to the Petitioner, Counsel cannot be said to have rendered deficient performance. Petitioner rejected the plea offers, so Counsel's handling of the State's plea offers did not prejudice Petitioner. Counsel therefore did not render ineffective assistance as to this issue.

### 3. Other Issues

In addition to Petitioner's contentions about Counsel's declining to cross-examine Dr. Piercey and failure to discuss the State's plea offers, Petitioner's brief states the following:

> [C]ounsel for [Petitioner] failed to follow through or honor any of the requests made by [Petitioner]. His counsel failed to call certain witnesses to testify on [Petitioner's] behalf. His counsel failed to properly explain the timeline or sequence of evidence which likely left the jury with a confused sense of when and where certain events took place.

This paragraph contains no argument with citations to authorities and appropriate citations to the record, as required by Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure. Rule 10(b) of this court states, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."

Accordingly, we treat any issues incorporated under this paragraph, and any other issues related to Petitioner's ineffective assistance of counsel claim, as waived.[3]

### III. Conclusion

Based on the above, we affirm the post-conviction court's denial of relief.

_____

MATTHEW J. WILSON, JUDGE

---

[3] Even if issues regarding Counsel's failure to call witnesses and challenge the timeline are not waived, they are without merit. At the post-conviction hearing, Petitioner did not present the testimony of, or summarize the proof that could have been presented by, the supposedly excluded witnesses at trial. Accordingly, Petitioner has failed to establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Petitioner also did not present any other evidence, apart from his own self-serving testimony, regarding the supposed inaccuracies in the timelines presented at trial, so he also failed to establish prejudice as to that issue.